**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

**EUGENIO ALVAREZ,** *individually and on*
*behalf of all others similarly situated,*

              Plaintiff,                              Case No. 4:24-cv-3597

v.

**NEWREZ LLC d/b/a SHELLPOINT**
**MORTGAGE SERVICING,**

              Defendant.

## CLASS ACTION COMPLAINT

### I.    INTRODUCTION

1.    Plaintiff, individually and on behalf of all others similarly situated, alleges violations of the Texas Fair Debt Collection Act ("TDCA") and the laws of six other states whose debt collection laws are materially uniform, and seeks damages against Defendant Newrez LLC d/b/a Shellpoint Mortgage Servicing ("Defendant" or "Shellpoint").

2.    On May 1, 2024, Shellpoint's parent company, Rithm Capital Corporation, completed its previously announced acquisition of Computershare Mortgage Services Inc. and certain affiliated companies, including Specialized Loan Servicing LLC ("SLS"). Immediately following the closing of the acquisition, SLS merged into Shellpoint. The violations described in this Complaint were committed by SLS prior to the merger.

3.    Shellpoint is a large servicer of borrowers' residential mortgages ("Uniform Mortgages"), as was SLS. SLS routinely violated Texas law and the laws of six other states by charging and collecting illegal processing fees when borrowers paid their monthly mortgage by phone ("Pay-to-Pay Fees"). SLS illegally charged homeowners fees up to $7.50 for each telephone payment.

4.      SLS paid third parties to process its Pay-to-Pay transactions. A substantial amount of the $7.50 Pay-to-Pay Fee was marked-up profit to SLS because its processors processed Pay-to-Pay transactions at a cost of $0.50 or less per transaction. SLS pocketed the difference between the amount paid by borrowers and the actual expense it paid its processors to process Pay-to-Pay transactions. This is an overcharge of up to $7.00 per transaction paid by Class Members.

5.      Despite its uniform contractual obligations to charge only fees explicitly allowed under the Uniform Mortgages and applicable law, SLS leveraged its position of power over homeowners and demanded exorbitant Pay-to-Pay Fees. Even if some fees were allowed, the mortgage uniform covenants and applicable law only allowed SLS to pass along the actual costs of fees incurred to it by the borrowers—here, less than a dollar per transaction.

6.      Plaintiff paid these Pay-to-Pay Fees and brings this class action lawsuit individually and on behalf of all similarly situated class members.

## II.    PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Eugenio Alvarez is a natural person residing in this District. During all relevant times herein, Mr. Alvarez owned property in this District secured by a mortgage. SLS was his mortgage servicer until the merger with Shellpoint. SLS regularly charged Mr. Alvarez up to $7.50 Pay-to-Pay Fees when he made mortgage payments over the phone.

8.      Defendant Newrez LLC d/b/a Shellpoint Mortgage Servicing is a Delaware corporation with its principal place of business in Fort Washington, Pennsylvania. On May 1, 2024, Shellpoint's parent company, Rithm Capital Corporation, completed its previously announced acquisition of Computershare Mortgage Services Inc. and certain affiliated companies, including Specialized Loan Servicing LLC ("SLS"). Immediately following the closing of the acquisition, SLS merged into Shellpoint.

9.     This Court has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act because diversity exists between the Defendant and at least one class member, and the amount in controversy exceeds $5,000,000. *See* 28 U.S.C. 1332(d)(2).

10.     This Court has personal jurisdiction over the Defendant because Shellpoint transacts business in this District and because SLS committed torts in this District, as described in this Complaint.

11.     Venue is proper anywhere in this District pursuant to 28 U.S.C. § 1391 because the causes of action accrued in this District.

## III.    APPLICABLE LAW

12.     The Texas Debt Collection Act ("TDCA") prohibits a debt collector from "us[ing] unfair or unconscionable means" in the collection of a consumer debt. Tex. Fin. Code § 392.303(a).

13.     Shellpoint is, and SLS was, a debt collector under the TDCA because each was "a person who directly or indirectly engages in debt collection …." *Id*. § 392.001(6).

14.     SLS engaged in debt collection, which the TDCA defines as "an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor." *Id*. § 392.001(5).

15.     A consumer debt under the TDCA is "an obligation, or an alleged obligation, primarily for personal, family, or household purposes and arising from a transaction or alleged transaction." *Id*. § 392.001(2).

16.     As "an individual who has a consumer debt," Plaintiff is a "consumer" as defined by the TDCA. *Id*. § 392.001(1).

3

17.     The Pay-to-Pay Fees SLS collected are not authorized by HUD regulations or by Plaintiff's deed of trust (the "Alvarez Deed of Trust") — or any other standard deed of trust or mortgage.

18.     By collecting Pay-to-Pay Fees, SLS "represent[ed] that a consumer debt may be increased by the addition of . . . service fees, or other charges," even though "a written contract or statute does not authorize the additional fees or charges." Tex. Fin. Code § 392.304(a)(12).

19.     By collecting those fees, SLS also employed the unfair and unconscionable practice of "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer[.]" *Id.* § 392.303(a)(2).

20.     Section 1692f(1) of the Federal Debt Collection Practices Act ("FDCPA") likewise prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. 1692f(1).

21.     Other states have debt collection statutes like the TDCA that adopt Section 1692f(1) outright or contain the same or materially uniform language prohibiting Pay-to-Pay Fees. Along with Texas, these states (the "Fee-Prohibiting States") and the relevant statutes are as follows:

     a.     **California.** California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act") makes it illegal for any entity covered by it to violate Sections 1692b to 1692j of the FDCPA. Cal. Civ. Code § 1788.17. In so

doing, it makes those meeting the definition of "debt collector" set forth in section 1788.2(c) liable for violating the FDCPA.

b.    **Iowa.** Iowa prohibits the "collection of or the attempt to collect interest or other charge, fee or expense incidental to the principal obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation and is legally chargeable to the debtor, or is otherwise legally chargeable." Iowa Code § 537.7103(5)(d).

c.    **Maryland.** Maryland prohibits collectors subject to the Maryland Consumer Debt Collection Act ("MCDCA") from engaging in "any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act" (Section 808 of the FDCPA is codified in 15 U.S.C. § 1692f(1)). Md. Code Ann., Com. Law § 14-202 (11).

d.    **Oregon.** Oregon makes it unlawful for a debt collector to "[c]ollect[] or attempt[] to collect interest or other charges or fees that exceed the actual debt unless the agreement, contract or instrument that creates the debt expressly authorizes, or a law expressly allows, the interest or other charges or fees." Or. Rev. Stat. § 646.639(2)(n).

e.    **New Hampshire.** New Hampshire makes it unlawful for a debt collector to "[c]ollect[] or attempt[] to collect any interest or other charge, fee or expense incidental to the principal obligation unless such interest or incidental fee, charge or expense is expressly authorized by the agreement creating the obligation and legally chargeable to the debtor." N.H. Rev. Stat. Ann. § 358-C:3(X).

f.   **West Virginia.** West Virginia prohibits "[t]he collection of or the attempt

to collect any interest or other charge, fee or expense incidental to the

principal obligation unless such interest or incidental fee, charge or

expense is expressly authorized by the agreement creating or modifying

the obligation and by statute or regulation." W. Va. Code § 46A-2-128(d).

## IV.    FACTUAL ALLEGATIONS

### A.    Mortgage Lenders Retained SLS to Service and Collect Mortgage Debt.

22.    SLS was a loan servicer and sub-servicer that operated nationwide. SLS bought

mortgage servicing rights or contracts to sub-service mortgage servicing with a primary servicer

and exercised those mortgage servicing rights to collect mortgage payments, charge authorized

fees, enforce mortgages or deeds of trust and notes, and initiate foreclosure on properties that

secured mortgages or deeds of trust and notes. SLS did not disclose the terms of its servicing

agreements publicly.

23.    SLS entered into service agreements with lenders, primary servicers, note holders,

and trustees, pursuant to which SLS provided servicing, sub-servicing and agency activities for

loan portfolios. In accordance with those agreements, SLS was compensated by the lenders,

noteholders, and trustees to act as their agent and to exercise their rights and responsibilities

pursuant to their approval.

24.    SLS either took assignment of the servicing obligations in borrowers' loan

agreements, and/or was in functional privity and near privity of contract with Plaintiff and Class

Members, tasked with performing many of the obligations assumed by the lenders to Plaintiff's

and Class Members' loan agreements.

1.      **Overview of the Mortgage Industry and Its Standardized Lending Practices**

25.      The residential mortgage lending industry is generally divided between two types of loans. The vast majority of loans are "conforming" loans that "conform" with particular uniform terms, conditions, and amounts under a certain threshold set by the Federal Housing Finance Agency in coordination with Federal National Mortgage Association ("FNMA" or "Fannie Mae") and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac").

26.      FNMA and FHLMC are federally chartered corporations and are known as Government-Sponsored Enterprises ("GSEs"). In 2021, the funding threshold for Fannie Mae/Freddie Mac conforming loans was $528,250 in many places, and up to $970,800 in higher cost-of-living areas. Loans that do not conform to these standards are typically "jumbo" loans and require more specialized underwriting due to the higher value of the property securing the mortgage.

27.      Conforming loans include both government loans (*i.e.*, those insured by the Federal Housing Administration, Veterans' Administration, or the U.S. Department of Agriculture), and conventional loans. Conforming loans must "conform" to the nationwide standards set by the GSEs, which purchase them to sell as pooled securities in the secondary market.

28.      To ensure ease of securitization, the GSEs create standard mortgage and deed of trust templates for all conventional loans, and the government agencies' templates are modeled after those GSE templates. While these templates contain sections for language that incorporates state requirements, this process too contains standardized language.

29.      Because the conforming lending process depends on standardization, all borrowers go through the same process to obtain a conforming loan. Mortgage lenders typically

use industry software to generate the standardized templates and complete the templates with the borrowers' information. Once approved to borrow the funds, the borrowers execute these standard loan documents. Because the GSEs will accept for securitization only those loans that adhere to their standard loan documents, a lender cannot add additional terms and there is no room for negotiation of any kind.

30.    After the mortgage or deed of trust agreement is finalized, the mortgage lender often sells the mortgage loan to the GSEs, who in turn bundle that mortgage loan with other conforming loans to sell as securities to investors in the form of mortgage-backed securities, which are bond-like securities that are secured by the homes.

31.    While the original mortgage lender may remain to service the securitized and pooled loan, the primary servicer or GSE often retains another servicer or sub-servicer (such as SLS) that specializes in the actual management and administration of mortgages to perform the servicing obligations required by the Uniform Mortgages.

### 2.    Mortgage Lenders and Note Holders Retain Mortgage Servicers Like Shellpoint and SLS to Accept Payments and Collect Mortgage Debt from Borrowers.

32.    Pursuant to the contractual or assignment process, the mortgage servicer or sub-servicer and the lender or GSE negotiate a fee schedule to compensate the mortgage servicer or sub-servicer for collecting payments and other servicing and collections work. The borrower has no role in this process.

33.    The fees paid to mortgage servicers or sub-servicers by the lender or GSEs come in a variety of forms. First, mortgage servicers or sub-servicers negotiate a servicing fee, which is typically a percentage of approximately 0.25-0.5% of a borrower's outstanding mortgage balance on an annual basis. The average balance on a mortgage loan in this country is $208,000. Thus, if a mortgage servicer agrees to perform work for .5% of the borrowers' balance, and a

borrower has a $208,000 balance on the mortgage, the servicer will receive $1,040 a year, or $86.67 a month to accept the payment from the borrower and apply it to the balance. The servicing agreement between the servicer or sub-servicer and lender or GSEs also includes other fee schedules negotiated between those contracting parties and may include things like allowing the holder of the mortgage loans to retain late fees (capped by the GSEs and set in the standardized loan templates) and the ability to retain interest on borrowers' escrow payments.

34.     Consumer borrowers have no say in who their designated loan servicers will be. Nor are they required to pay for loan servicing beyond paying their mortgage and agreed interest.

**B.     SLS Was a Debt Collector and Profited from Charging Pay-to-Pay Fees.**

35.     SLS worked in interstate commerce, collecting mortgage debt from borrowers nationwide. It was registered and licensed as a mortgage servicer, collection agency, debt collector, or similar designation in states around the country. It was retained by GSEs, note holders, and lenders to collect on mortgage debt pursuant to the terms of the Uniform Mortgages, which contemplate monthly payments (payable on the first of every month). Thus, it was engaged in the regular collection of debt from residential mortgage borrowers.

36.     Each time a mortgage borrower whose loan was serviced by SLS made a loan payment over the phone ("Pay-to-Pay Transactions"), SLS charged the borrower a Pay-to-Pay Fee of up to $7.50.

37.     The cost for SLS to process Pay-to-Pay Transactions was well below the amounts charged to borrowers, and SLS illegally pocketed the difference as profit.

38.     The uniform contractual obligations in the mortgages SLS serviced did not authorize SLS to assess Pay-to-Pay Fees. At most, the mortgage uniform covenants ("Uniform Mortgages") allowed SLS to pass along only the actual costs of fees incurred by it to the borrower.

39.     SLS violated its borrowers' Uniform Mortgages when it assessed such fees. SLS frequently, intentionally, and persistently collected Pay-to-Pay Fees even though such fees are not authorized by the borrowers' mortgages, and SLS therefore had no right to collect them.

40.     Uniform Mortgages contemplate the monthly payment of mortgages by check or other electronic payment methods. Payments by check can cost loan servicers like Shellpoint and SLS anywhere between $1 and $4 a month in processing and other fees, per a 2015 report by the Association for Financial Professionals. Every check needs to be opened, reviewed, keyed into the computer system to apply to the loan, and deposited. Delays in postal operations and the high risk of human error generate customer service calls and require internal checkpoints and increased oversight. Borrowers who are concerned about the timeliness of the payment may call to ensure it was received and properly credited, adding to the customer service work associated with this routine part of servicing.

41.     Because it is so expensive to process check transactions, every mortgage servicer in the country offers borrowers the option of having their monthly payment automatically debited via the ACH system. While offered under the auspice of improving services for borrowers, the cost of an ACH transaction is typically only few cents and its electronic nature reduces overhead costs enormously.

42.     Still, for many borrowers, the automatic ACH system is impractical as it requires a borrower to agree to a fixed amount and date for the debit each month out of a pre-determined bank account, and increases a borrower's vulnerability to banking errors. Borrowers may have budgetary needs or personal preferences that cause them to want more control over their finances. Some may wish to choose their payment method on a monthly basis. Others may be

sharing responsibility for paying the mortgage with another person, and funds to pay it come from multiple bank accounts.

43.     To reduce the expense caused by borrowers who pay as required but prefer more control than the automatic ACH option provided to them, many servicers offer to borrowers the option to pay by phone or online. This option typically costs servicers less than 50 cents a transaction, far less than the cost of paying by check, and like the automatic ACH method, includes increased electronic efficiencies.

44.     Because the cost savings is so significant, most mortgage servicing companies, as well as third-party debt collectors, allow consumers to make their mortgage payments over the phone, and many loan servicers offer these services for free. While phone payment methods are marketed as convenient for consumers, they are more cost-effective for the servicers over accepting paper checks. Thus, mortgage servicers find their profits increase substantially by simply increasing choices to customers.

45.     Each time a borrower whose loan was serviced by SLS made a payment over the phone, it charged the borrower a Pay-to-Pay Fee of up to $7.50.

46.     These Pay-to-Pay Fees were materially higher than the costs incurred by SLS, can add up to hundreds of dollars over the life of a single loan, and provided millions of dollars in profits for SLS. Typically, a loan servicer will use a vendor to process transactions; these third-party vendors, such as Western Union and ACI Worldwide, charge other loan servicers $.50 or less per phone transaction. The Association for Financial Professionals reported in 2022 that the median cost for processing these transactions was between 26 and 50 cents, much less than its estimated check processing costs of $2 to $4.

47.     SLS's imposition of Pay-to-Pay Fees also amounted to double-charging. In the example above where SLS hypothetically negotiated a 0.5% servicing fee, SLS agreed to receive that rate regardless of how the borrower elects to pay, knowing that it was obligated to accept payments via check from every borrower. Thus, out of the $86.67 it received each month out of the loan payment being made by the borrower, it could incur as much as $4 in costs to process check payments, leaving $82.67 to cover other overhead costs and for its profit. SLS double-charged borrowers by charging additional Pay-to-Pay Fees, up to $7.50 for each phone payment, over and above its negotiated servicing fees agreed with the lender, GSE or primary servicer.

48.     SLS purported to be providing a valuable service to borrowers to which they would not otherwise be entitled. But many mortgage loan servicers offer online and phone payments for free because of the cost savings to the servicers when borrowers pay via these methods as opposed to by paper check. Thus, providing the service is not contingent on being able to charge for the service. Further, borrowers already paid SLS to service their loans by paying their mortgages. If SLS wanted to earn more revenue, it could have negotiated larger fees from the lenders, primary servicers or GSEs. It should not have double-dipped – pocketing the servicing cut, while up-charging borrowers for the same transactions.

49.     The Pay-to-Pay Fees materially exceeded the costs incurred by SLS to process the phone payments, generating millions of dollars in unlawful profits for SLS.

50.     SLS was able to collect these illegal Pay-to-Pay Fees because borrowers could not choose another mortgage servicer or shop around for a better deal. Borrowers were forced by their lenders to use SLS as their loan servicer.

51.     The majority of servicers do not charge for these fees, and for those that do (or used to), the fees are often lower than SLS's $7.50 fee. For example:

12

| Servicer | Practice |
|---|---|
| Arvest Central Mortgage Co. | Stopped charging Pay-to-Pay Fees in 2021; previously charged $5 |
| Bank of America | Does not charge Pay-to-Pay Fees |
| BB&T Bank | Does not charge Pay-to-Pay Fees |
| BNB Bank | Does not charge Pay-to-Pay Fees |
| Caliber Home Loans | Stopped charging Pay-to-Pay Fees in 2019; previously charged $3-$5 |
| Carrington Mortgage | Stopped charging Pay-to-Pay Fees to most borrowers in 2022; previously charged $5-$10 |
| Chase Home Lending | Does not charge Pay-to-Pay Fees |
| Citibank | Does not charge Pay-to-Pay Fees |
| Citizens Bank | Does not charge Pay-to-Pay Fees |
| EastWest Bank | Does not charge Pay-to-Pay Fees |
| First Mortgage | Does not charge Pay-to-Pay Fees |
| Freedom Mortgage | Stopped charging in 2021; previously charged $15 |
| KeyBank Mortgage | Does not charge Pay-to-Pay Fees |
| LoanCare | Stopped charging Pay-to-Pay Fees in 2020, resumed in 2022 in some states; charging $5-$10 |
| M&T Bank | Stopped charging Pay-to-Pay Fees in 2019 |
| PHH Mortgage Corp (formerly Ocwen) | Stopped charging in California and West Virginia in 2022; charging up to $15 elsewhere |
| Prime Lending Mortgage | Does not charge Pay-to-Pay Fees |
| Quicken Loans | Does not charge Pay-to-Pay Fees |
| Roundpoint Mortgage Servicing | Stopped charging Pay-to-Pay Fees in 2022; previously charged $5-10 |
| Rushmore Loan Management Services | Stopped charging Pay-to-Pay Fees in 2022, previously charged $5-10 |
| Select Portfolio Servicing | Charges up to $15 |

| Servicer | Practice |
|----------|----------|
| SunTrust | Does not charge Pay-to-Pay Fees |
| TD Bank | Does not charge Pay-to-Pay Fees |

**C.    SLS's Pay-to-Pay Fees Were Oppressive, Substantially Injurious to Consumers, and Violated Public Policy.**

52.    As discussed herein, Pay-to-Pay Fees have been condemned by borrowers, federal and state legislatures, regulators, and attorneys general. Because of this, SLS was part of a dwindling minority of mortgage servicers still charging these fees.

53.    The federal government and state governments have issued statements condemning Pay-to-Pay Fees and prohibiting loan servicers and debt collectors from assessing them.

54.    In October 2022, President Biden announced that his administration would be taking steps to go after unfair "junk fees" such as Pay-to-Pay Fees. Around that time, the FTC announced that it was seeking comments on "junk fees," the "unnecessary, unavoidable, or surprise charges that inflate costs while adding little to no value." https://www.ftc.gov/news-events/news/press-releases/2022/10/federal-trade-commission-explores-rule-cracking-down-junk-fees (last accessed Aug. 16, 2024). Among the junk fees on which the FTC sought commentary were those imposed on "captive consumers," such as those who are dealing with a company that has "exclusive rights." *Id.* Chair Lina M. Khan explained that:

> No one has ever felt that a 'convenience fee' was convenient. Companies should compete to provide the best quality at the best price, not to see who can squeeze the most added expenses out of consumers. That's especially true at a time when families are struggling with the effects of inflation.

*Id.*

14

55.     The CFPB has been taking steps to address junk fees like Pay-to-Pay Fees. In June 2022, it issued an advisory opinion in which it "affirm[ed]" its position that imposition of "pay-to-pay or 'convenience' fees, such as fees imposed for making a payment online or by phone," where those fees are not contractually or legally authorized, is an "unfair or unconscionable means to collect or attempt to collect any debt" prohibited by Section 808(1) of the FDCPA and the CFPB's regulations implementing that provision. https://files. consumerfinance.gov /f/documents/cfpb_convenience-fees_advisory-opinion_2022-06.pdf (last accessed Aug. 16, 2024).

56.     This advisory opinion comes on the heels of other efforts by the CFPB to respond to the problems caused by Pay-to-Pay Fees. In October 2021, the CFPB, filed an *amicus* brief in a matter before the Ninth Circuit agreeing that the FDCPA prohibits the charging of any amount not expressly authorized by the agreement creating the debt or otherwise affirmatively permitted by state law. The CFPB explained:

> The FDCPA was designed to rein in unethical debt collectors, and Section 1692f(1) specifically was designed to limit the amounts that debt collectors could try to collect from consumers. But under the district court's interpretation, debt collectors can collect additional fees, like the pay-to-pay fees at issue here, whenever no other law specifically prohibits them—leaving debt collectors with the power and discretion to try to collect additional fees during the collection process. This is particularly problematic given that consumers have no ability to shop around for a better deal. And it's not as if these pay-to-pay fees are necessary for debt collectors to offer phone or online payment options that consumers might want, as it is generally cheaper for collectors to accept payment by phone or online than to accept payment by mail (which is typically the fee-free option). Pay-to-pay fees are thus most often just a way for debt collectors to take advantage of consumers by trying to extract more money than they originally bargained for or reasonably expected to pay.

*Thomas-Lawson v. Carrington Mort. Servs.*, 9th Cir. No. 21-55459, Dkt. 22 (Brief of Amicus Curiae Consumer Financial Protection Bureau in Support of Plaintiffs-Appellants) at 11.

57.    The CFPB 's position on Pay-to-Pay Fees is not new. In 2017, the CFPB put out a bulletin on "Phone Pay Fees," in which it warned financial services providers and debt collectors about the many ways in which their fees for making payments over the phone could violate laws. In the bulletin, the CFPB expressly warned mortgage servicers that this practice might violate the FDCPA, stating:

> Supervision has found that one or more mortgage servicers that met the definition of "debt collector" under the FDCPA violated the Act when they charged fees for taking mortgage payments over the phone to borrowers whose mortgage instruments did not expressly authorize collecting such fees and who reside in states where applicable law does not expressly permit collecting such fees. Supervision directed one or more servicers to review mortgage notes and applicable state law, and to only collect pay-by-phone fees where expressly authorized by contract or state law.

https://files.consumerfinance.gov/f/documents/201707_cfpb_compliance-bulletin-phone-pay-fee.pdf ("CFPB 2017 Bulletin") (last accessed Sep. 23, 2024).

58.    State regulators have also taken action. In April 2022, in response to the CFPB's request for information on this issue, a coalition of 22 state attorneys general called on the CFPB to prohibit mortgage servicers from charging Pay-to-Pay fees. https://ag.hawaii.gov/wp-content/uploads/2022/04/State-Attorneys-General-Multistate-Comment-Letter-to-CFPB_convenience-fees_4.11.22_final.pdf (last accessed Sep. 23, 2024). The group submitted comments solely on the Pay-to-Pay Fees charged by mortgage servicers. The State AGs noted that Pay-to-Pay Fees are particularly problematic, explaining, "And since mortgage borrowers are a captive market for their particular servicer, borrowers can't simply avoid the fees by taking their business elsewhere." *Id.* at 2.

59.    Similarly, in 2021, a coalition of 33 state attorneys general intervened to object to a settlement with another large mortgage servicer, when the terms of that agreement purported to permit the servicer to force borrowers to modify their Uniform Mortgages to allow it to assess

Pay-to-Pay Fees. The New York Attorney General, speaking for the coalition, condemned the

fees as unlawful:

> "When Americans utilize online or phone payments to pay off their monthly mortgages, [mortgage servicer] PHH benefits, but instead of passing those savings on to homeowners PHH charged illegal fees and increased costs for nearly one million Americans," said Attorney General James. "PHH's sole purpose is to collect and process homeowners' payments, which it already makes millions of dollars from each year. In the 21st century, when most Americans pay their bills online or by phone, to charge fees on top of what they are already being paid is not only unethical, but unlawful. . . .

> For years, PHH charged nearly one million homeowners an illegal fee — ranging from $7.50 to $17.50 — each time a homeowner made a monthly mortgage payment online or by phone, despite most Americans paying their mortgages one of these two ways. Nowhere in these homeowners' mortgage contracts is there authorization for such fees and PHH does not charge "processing" fees for any other customers, including those who pay by check or those who set up automatic debit payments. Charging fees not mentioned in the mortgage contract is illegal and, under New York's mortgage servicing regulations, explicitly forbidden.

Source: https://ag.ny.gov/press-release/2021/attorney-general-james-leads-bipartisan-coalition-

fighting-protect-nearly-one (Jan. 29, 2021) (last accessed Sep. 23, 2024).

### D.    Plaintiff's Allegations

60.    Mr. Alvarez owns property in Texas that is secured by a mortgage and the

Alvarez Deed of Trust. Mr. Alvarez executed the Alvarez Deed of Trust on July 25, 2017, for

$66,500 (Exhibit A). Mr. Alvarez's mortgage loan is secured by his property for personal,

family, or household uses.

61.    SLS was the servicer for Mr. Alvarez's mortgage through May 1, 2024.

Shellpoint is now the servicer for Mr. Alvarez's mortgage.

62.    Mr. Alvarez has made payments over the phone. Each time he did so prior to May

1, 2024, SLS charged him a Pay-to-Pay Fee.

63.    The Alvarez Deed of Trust does not authorize Pay-to-Pay Fees.

17

64.     The Alvarez Deed of Trust states that the "Lender may not charge fees that are expressly prohibited by this Security Agreement or by Applicable Law." Ex. A ¶ 14. The Alvarez Deed of Trust defines Applicable Law as "all controlling applicable federal, state, and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. A ¶ J.

65.     SLS's collection of Pay-to-Pay Fees violated the TDCA and the laws of six other states whose debt collection laws are materially uniform because the Alvarez Deed of Trust did not expressly allow SLS to charge Pay-to-Pay Fees. Nevertheless, SLS collected these fees as though they were allowed, failing to disclose that the fees were not authorized. SLS also failed to disclose that these fees were not the actual costs of the transaction incurred by SLS. The collection of these fees was an unfair and deceptive trade practice that violated the TDCA and the laws of six other states whose debt collection laws are materially uniform.

66.     SLS acted deceitfully by assessing Plaintiff more in Pay-to-Pay Fees than it actually disbursed to process to Pay-to-Pay Transactions.

**E.      Shellpoint Has Been Repeatedly Informed of the Wrongful and Illegal Nature of Pay-to-Pay Fees.**

67.     Shellpoint has been duly and adequately notified and informed that SLS was in violation of state and federal law.

68.     On July 2, 2024, prior to filing this Complaint, Mr. Alvarez made a written pre-suit demand upon Shellpoint, mailing it by certified mail.

69.     Shellpoint was given a reasonable opportunity to cure the violations complained of herein, but has failed to do so. Despite receiving this notice, Shellpoint has refused to remedy its violations. Further notice would be futile.

70.     In addition to the pre-suit notice Plaintiff provided, SLS was long aware that the assessment of Pay-to-Pay Fees is illegal but refused to make modifications.

71.     Shellpoint and SLS were aware of state and federal regulators' statements and positions on Pay-to-Pay Fees. Indeed, as mortgage servicers, Shellpoint and SLS would have received and read the CFPB 2017 Bulletin and been on notice that their Pay-to-Pay Fees were illegal and violated federal debt collection law. Shellpoint and SLS would also be aware of the various statements and actions by regulators described herein.

72.     In addition, Shellpoint has been sued by borrowers in other states over its Pay-to-Pay practices. For example, in November 2020, a borrower filed a lawsuit alleging that Shellpoint's Pay-to-Pay practices violated West Virginia law. Shellpoint paid over $4.5 million to settle that lawsuit. *See Cox v. NewRez, LLC*, Final Approval Ord. and Judgment (ECF 71) (S.D. W.Va. Dec. 5, 2022), at 17 (awarding attorneys' fees exceeding $1.5 million, "which represents one-third of the settlement fund").

73.     Moreover, by virtue of their role as mortgage servicers, Shellpoint and SLS would have been aware of the many lawsuits against mortgage loan servicers who charged Pay-to-Pay Fees. Over the last six years, numerous class action lawsuits were filed against nearly every major mortgage loan servicer in multiple states, including Nationstar Mortgage LLC, Ocwen Loan Servicing, LoanCare LLC, and Caliber Home Loans.

74.     Thus, at the time Plaintiff provided notice to Shellpoint in July 2024, Shellpoint had been notified that SLS's practice of charging Pay-to-Pay fees violated state and federal laws and public policy, as well as other legal duties and obligations. Via their roles as servicers, Shellpoint and SLS also had extensive relevant information available, which was more than

sufficient for them to understand the full extent of the illegality of SLS's fee practices. Shellpoint

nevertheless failed to cure SLS's violations.

75.     Given Shellpoint's and SLS's multi-year refusal to cure, additional pre-suit

notices from Plaintiff or any absent class member would have been futile and would stand as an

unreasonable barrier to the enforcement of their contractual and statutory rights.

## V.     CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action under Federal Rule of Civil Procedure 23(a), (b)(2),

and (b)(3) on behalf of the following classes of persons, subject to modification after discovery

and case development:

> **Texas Class:** All persons in the United States (1) with residential property located
> in the State of Texas, (2) secured by a loan that was serviced by SLS prior to May
> 1, 2024 (3) who were charged one or more Pay-to-Pay Fee, and (4) whose
> mortgage or deed of trust did not expressly authorize the collection of Pay-to-Pay
> Fees.

> **Fee-Prohibiting State Class:** All persons in the United States (1) with residential
> property located in a Fee-Prohibiting State, (2) secured by a loan that was
> serviced by SLS prior to May 1, 2024 (3) who were charged one or more Pay-to-
> Pay Fee, and (4) whose mortgage or deed of trust did not expressly authorize the
> collection of Pay-to-Pay Fees. The Fee-Prohibiting States are defined as
> Maryland, California, Iowa, New Hampshire, Oregon, Texas, and West Virginia.

77.     Class members are identifiable through Shellpoint's records and payment

databases.

78.     Excluded from the classes are Shellpoint; any entities in which it has a controlling

interest; its agents and employees; and any judge to whom this action is assigned and any

member of such judge's staff and immediate family.

79.     Plaintiff proposes that he be appointed as class representative for both classes.

80.     Plaintiff and Class Members have all been harmed by SLS's actions.

81.     Numerosity is satisfied. Upon information and belief, there are thousands of Class Members. Individual joinder of these persons is impracticable.

82.     There are questions of law and fact common to Plaintiff and all Class Members, including, but not limited to:

a.     Whether SLS violated state law by charging Pay-to-Pay Fees not due;

b.     Whether SLS violated state law by charging Pay-to-Pay Fees not due and unreasonable;

c.     Whether SLS's costs for Pay-to-Pay Transactions were less than the amounts it charged for Pay-to-Pay Fees;

d.     Whether Plaintiff and Class Members are entitled to actual and/or statutory damages as a result of SLS's actions; and

e.     Whether Plaintiff and Class Members are entitled to attorneys' fees and costs.

83.     Plaintiff's claims are typical of the claims of Class Members. SLS charged Plaintiff Pay-to-Pay Fees in the same manner as the Class Members. Plaintiff and Class Members entered into Uniform Mortgages that prohibit Pay-to-Pay Fees. Alternatively, if SLS was allowed under the Uniform Mortgages to charge Pay-to-Pay Fees, such amount is capped at the actual amounts disbursed by SLS to process Pay-to-Pay transactions.

84.     Plaintiff is an adequate representative of both Classes because his interests do not conflict with the interests of the Class Members and he will fairly and adequately protect the interests of the Classes. Plaintiff has taken actions before filing this Complaint, by hiring skilled and experienced counsel and by making pre-suit demands, to protect the interests of Class Members.

85.     Plaintiff has hired counsel that are skilled and experienced in class actions and are adequate class counsel capable of protecting the interests of Class Members.

86.     Common questions of law and fact predominate over questions affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication of this controversy.

87.     The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

**COUNT I**
**VIOLATION OF SECTION 392.304(a)(12) OF THE TEXAS DEBT COLLECTION ACT**
**(on behalf of Plaintiff and the Texas Class)**

88.     All prior and subsequent paragraphs are incorporated herein by reference.

89.     The Alvarez Deed of Trust secures the note he used to purchase his residence in the State of Texas. Plaintiff is therefore a "consumer" as defined by the TDCA, who incurred a "consumer debt."

90.     Shellpoint, in its own right and as successor to SLS, is a "debt collector" as defined by the TDCA. SLS was also a "debt collector" as defined by the TDCA.

91.     In the process of "debt collection," SLS collected from Plaintiff Pay-to-Pay Fees that were not authorized by any written contract or statute.

92.     By collecting Pay-to-Pay Fees, SLS "represent[ed] that a consumer debt may be increased by the addition of . . . service fees, or other charges," even though "a written contract or statute does not authorize the additional fees or charges." Tex. Fin. Code § 392.304(a)(12).

93.     As such, SLS employed fraudulent, deceptive, or misleading representations in the collection of consumer debt, in violation of the TDCA.

94.     On behalf of the Class, Plaintiff seeks actual damages.

22

**COUNT II**
**VIOLATION OF THE TEXAS DEBT COLLECTION ACT AND**
**MATERIALLY UNIFORM STATE FEE-PROHIBITING STATUTES**
**(on behalf of Plaintiff and the Fee-Prohibiting State Class)**

95.     All prior and subsequent paragraphs are incorporated herein by reference.

96.     Plaintiff brings this claim individually and on behalf of the multistate Fee-Prohibiting State Class under the state fee-prohibiting statutes, all of which incorporate or otherwise contain language mirroring Section 1692f(1) of the federal FDCPA. Section 1692f(1) prohibits "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). As to SLS's assessment of Pay-to-Pay Fees on these Classes, these state laws are materially uniform in the states of California, Iowa, Maryland, New Hampshire, Oregon, Texas, and West Virginia.

97.     The seven states identified above have enacted the following fee-prohibiting statutes, all of which are materially similar and were designed to effectuate the states' public policy against Pay-to-Pay Fees:

a.     California's Rosenthal Act provides that debt collectors "shall comply with the provisions of Sections 1692b to 1692j" of the FDCPA and prohibits "[c]ollecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code §§ 1788.14(b), 1788.17.

b.     Iowa prohibits the "collection of or the attempt to collect interest or other charge, fee or expense incidental to the principal obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement

23

creating the obligation and is legally chargeable to the debtor, or is otherwise legally chargeable." Iowa Code § 537.7103(5)(d).

c.    Maryland prohibits debt collectors from engaging in "any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act" (Section 808 of the FDCPA is codified in 15 U.S.C. § 1692f(1)), and provides that "[i]n collecting or attempting to collect an alleged debt[,] a collector may not" "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law § 14-202(8), (11).

d.    New Hampshire makes it unlawful for a debt collector to "[c]ollect[] or attempt[] to collect any interest or other charge, fee or expense incidental to the principal obligation unless such interest or incidental fee, charge or expense is expressly authorized by the agreement creating the obligation and legally chargeable to the debtor." N.H. Rev. Stat. Ann. § 358-C:3(X)

e.    Oregon makes it unlawful for a debt collector to "[c]ollect[] or attempt[] to collect interest or other charges or fees that exceed the actual debt unless the agreement, contract or instrument that creates the debt expressly authorizes, or a law expressly allows, the interest or other charges or fees." Or. Rev. Stat. § 646.639(2)(n).

f.    Texas prohibits a debt collector from "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer." Tex. Fin. Code Ann. § 392.303(2).

g.      West Virginia prohibits "[t]he collection of or the attempt to collect any interest or other charge, fee or expense incidental to the principal obligation unless such interest or incidental fee, charge or expense is expressly authorized by the agreement creating or modifying the obligation and by statute or regulation." W. Va. Code § 46A-2-128(d).

98.     The Rosenthal Act applies to Shellpoint and SLS because they regularly engage in debt collection as defined by the statute. *See* Cal. Civ. Code § 1788.2. Shellpoint and SLS are debt collectors under the statutory schemes of the other fee-prohibiting statutes identified above.

99.     All these fee-prohibiting statutes prohibit a debt collector from assessing any other charge, fee, or expense incidental to the principal and interest owed on Plaintiff's and Class Members' loans unless such fees are either expressly authorized in their loan agreements or expressly authorized by law. But Plaintiff's and Class Members' Uniform Mortgages do not expressly authorize the Pay-to-Pay Fees that SLS assessed when borrowers make telephone payments. Moreover, no law authorizes the imposition of Pay-to-Pay Fees on Class Members.

100.    SLS knew that these Pay-to-Pay Fees were not expressly set out in the Uniform Mortgages held by Plaintiff and members of the Fee-Prohibiting State Class. SLS also knew no law authorized collection of Pay-to-Pay Fees, yet it collected them anyway.

101.    In so doing, SLS collected amounts not authorized by Plaintiff's and Class Members' Uniform Mortgages or by law. As to Plaintiff and members of the Fee-Prohibiting State Class, SLS similarly violated all of the fee-prohibiting state statutes listed above.

102.    Plaintiff and the Class Members were harmed when SLS violated the fee-prohibiting statutes of the states listed above through the above-described conduct.

103.    As a result of each and every violation of the above-listed fee-prohibiting statutes, Plaintiff and Fee-Prohibiting State Class members are entitled to the following:

a.    California: Damages pursuant to Cal. Civ. Code § 1788.30(a); statutory damages for a knowing or willful violation to the full extent provided by law, pursuant to Cal. Civ. Code §§ 1788.30(b), 1788.17, and 1788.32; and reasonable attorneys' fees and costs under Cal. Civ. Code § 1788.30(c);

b.    Iowa: Actual damages and statutory damages to the full extent provided by law under Iowa Code § 537.5201;

c.    Maryland: Damages pursuant to Md. Code Ann., Com. Law § 14-203;

d.    New Hampshire: Actual damages or statutory damages of $200, whichever is greater, and reasonable attorneys' fees under N.H. Rev. Stat. Ann. § 358-C:4

e.    Oregon: Actual damages or statutory damages of $200, whichever is greater, punitive damages to the full extent provided by law, and reasonable attorneys' fees and costs under Or. Rev. Stat. § 646.641;

f.    Texas: Actual damages, statutory damages to the full extent provided by law, and reasonable attorneys' fees and costs under Tex. Fin. Code Ann. § 392.403;

g.    West Virginia: Actual damages and statutory damages to the full extent provided by law under W. Va. Code § 46A-5-101; and reasonable attorneys' fees and costs under W. Va. Code § 46A-5-104.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

1.　　　Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23, that Plaintiff is a proper class representative, and that his counsel are appointed Class Counsel;

2.　　　Award compensatory damages and restitution in the amount of all Pay-to-Pay Fees collected from Class Members, and interest on those fees;

3.　　　Award actual damages in an amount according to proof;

4.　　　Award statutory damages, punitive damages, and treble damages as provided by law;

5.　　　Award pre-judgment interest at the maximum rate permitted by applicable law;

6.　　　Award reasonable attorneys' fees and costs pursuant to applicable law; and

7.　　　Award such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff and Class Members hereby request a trial by jury.

Dated: September 23, 2024　　　　　Respectfully submitted,

**BAILEY GLASSER LLP**

_____*/s/ James L. Kauffman*_____
James L. Kauffman
1055 Thomas Jefferson St., NW, Suite 540
Washington, DC 20007
(202) 463-2101
jkauffman@baileyglasser.com

Bart D. Cohen
1622 Locust Street
Philadelphia, PA 19103
(215) 274-9420
bcohen@baileyglasser.com

Katherine M. Aizpuru
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Ave NW, Suite 1010
Washington, D.C. 20006
Phone: (202) 973-0900
kaizpuru@tzlegal.com

*Attorneys for Plaintiff and the Proposed Class*